752 F.Supp. 1527 (1990)
In re the DEPARTMENT OF ENERGY STRIPPER WELL EXEMPTION LITIGATION.
Otis P. PEAVEY, et al., and Sun Oil Company (Delaware), Plaintiffs,
v.
UNITED STATES DEPARTMENT OF ENERGY, et al., Defendants.
Civ. A. No. 78-1410.
United States District Court, D. Kansas.
November 15, 1990.
*1528 Don W. Crockett, Paul T. Michael, Edward P. Levy, U.S. Dept. of Energy, Economic Regulatory Admin., Washington, D.C., for defendant Department of Energy.
James Baller, Mary Ann Hammett, Baller Hammett, P.C., Washington, D.C., C.L. Carpenter, Oryx Energy Co., Dallas, Tex., James W. Sargent, Law Offices of James W. Sargent, Wichita, Kan., for plaintiffs Oryx Energy Co. and Sun Co., Inc.

MEMORANDUM AND ORDER
THEIS, District Judge.
This matter is before the court on the Department of Energy's motion to sever (Doc. 1845), the Department of Energy's motion for summary judgment (Doc. 1848), and the cross motion for partial summary judgment filed by Oryx Energy Company and Sun Company, Inc. (Doc. 1865). The court has considered the briefs filed by the parties, including the supplemental responses and replies. Neither party has requested oral argument.
The Department of Energy ("DOE") moves to sever its claim against Sun Oil Company (Delaware) from the claims Sun Oil Company (Delaware) has filed against Phillips Petroleum Company and Koch Industries, Inc. Oryx Energy Company, formerly Sun Exploration and Production Company and the successor to Sun Oil Company (Delaware), and Sun Company, Inc. (collectively "Sun") do not oppose the motion to sever. Therefore, the court shall grant the DOE's motion to sever.
In its motion for summary judgment, DOE seeks an order requiring Sun to deposit $30,806,581, plus all additional interest accruing after March 31, 1990 through the date of payment, into the escrow account established by the court. Sun's motion for partial summary judgment seeks an order holding that the interest rate to be *1529 applied on principal owed to the escrow by Sun be the escrow rate; and that Sun not be required to deposit funds attributable to severance taxes remitted to State taxing authorities and not recovered, funds attributable to interest on severance taxes recovered without interest and deposited into escrow, and funds attributable to the difference between interest paid on severance tax refunds and interest at the escrow rate.
The court is familiar with the standards governing the consideration of a motion for summary judgment. The Federal Rules of Civil Procedure provide that summary judgment is appropriate when the documentary evidence filed with the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trialwhether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
The burden at the summary judgment stage is similar to the burden of proof at trial. The court must enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact on its claim. Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials negating the opponent's claim." Id. at 323, 106 S.Ct. at 2552 (emphasis in original). Once the moving party has properly supported its motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial, relying upon the types of evidentiary materials contemplated by Rule 56. Fed.R.Civ.P. 56(e). Each party must demonstrate to the court the existence of contested facts on each claim it will have to prove at trial. Celotex, 477 U.S. at 324, 106 S.Ct. at 2553. The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden the party will face at trial on the particular claim. Anderson, 477 U.S. at 254, 106 S.Ct. at 2513.
For the purposes of the motions for summary judgment, the following facts as set forth by DOE are uncontroverted.
1. Sun operated and certified 49 properties as stripper well properties based on the inclusion of injection wells in the well count.
2. Resulting overcharges occurred on one or more of these Sun-operated properties during each month from January 1978 through January 1981. The total amount of these overcharges (including oil owned both by Sun and by other interest owners) was $114,210,185.
3. Deposits into the escrow account for these overcharges commenced in August 1979. Interest had already accrued on overcharges that had occurred from January 1978 through June 1979.
4. The amounts deposited for the overcharges were less than the amounts of overcharges outstanding at the time of each deposit. Additional interest accrued during the remainder of the overcharge period on these unpaid overcharge amounts.
5. Application of a portion of each deposit to pay the accrued interest resulted in only the residual amount of the deposit being applied to the overcharges.
6. The escrow deposits for the overcharges totalled $105,651,085, and the unpaid overcharges totalled approximately $14,387,703, as of April 1981.
*1530 7. Subsequent to that time, interest has continued to accrue on unpaid amounts that have remained outstanding. Escrow deposits were made during the months of August 1982 and October 1983, and each was sufficient to pay only a portion of the total amount outstanding at the time of the payment.
8. Using the interest rates set forth in DOE's Policy Statement on Interest, 46 Fed.Reg. 21,412 (April 10, 1981), and using the United States Rule that deposits are applied first to interest, the remaining deficiencies (with interest as of March 31, 1990) total $30,806,581.
The following additional facts as set forth by Sun are uncontroverted.
9. In August 1974, DOE issued Ruling 1974-29, which stated that injection wells could not be counted for the purpose of making stripper well determinations in sales of crude oil. 39 Fed.Reg. 44,414 (1974). At the time, many producers, including Sun, were counting injections wells for that purpose. Sun stopped counting injection wells and made refunds to all of its affected purchasers. [The court agrees with DOE that Sun's belief regarding the validity of Ruling 1974-29 is not material.]
10. Beginning in 1976, several producers brought declaratory judgment actions before this court to challenge Ruling 1974-29. As the number of such actions increased, owners of royalty interests in properties Sun operated requested that Sun begin counting injection wells. In some instances the interest owners threatened to sue Sun for any revenues they lost because of Sun's failure to count injection wells. These losses would occur because a DOE regulation, 10 C.F.R. § 212.131(a), prohibited recertifications and retroactive price increases more than two months after crude oil was sold. Sun responded that it would not count injection wells unless and until a court overturned the ruling.
11. On March 3, 1978, shortly after this court's invalidation of Ruling 1974-29, Sun decided to begin counting injections wells and to hold the resulting additional revenues in suspense pending appeal. Sun later became a party to this litigation, acquired a preliminary injunction, and transferred the suspended funds into the court's escrow. While not material here, Sun asserts it took the actions it did because it believed that failing to follow this court's decision might subject Sun to liability to its interest owners and shareholders for failing to charge the maximum allowable prices.
12. Once Sun decided to count injection wells, it began to remit into escrow the incremental revenues attributable to the counting of injection wells that Sun either earned as an interest owner or handled as the holder of division orders on properties on which either Sun or another party was the operator. Pursuant to this interpretation, Sun deposited nearly $120 million into escrow. Sun failed to remit overcharges from one tract, the Seeligson Unit, into escrow. Where third parties were involved, Sun gave them instructions on how to comply with the preliminary injunctions. When third party purchasers were remitting severance taxes to the State of Oklahoma on behalf of the interest owners of properties Sun operated, Sun advised the purchasers of the procedures they had to follow to ensure that they could get refunds for deposit into escrow if Ruling 1974-29 was upheld.
13. Sun developed a form for reporting payments to the escrow, which stated that the amount being deposited for each property each month was the net, rather than the gross, incremental amount. Sun filed these reports with the Clerk of the District Court each month and mailed copies to liaison counsel for the plaintiffs and to the DOE. DOE made no objection throughout the relevant period to Sun's method of making deposits.
14. In 1973, DOE began an audit to determine Sun's compliance with all regulatory requirements imposed by or within the jurisdiction of DOE. This audit resulted in a consent order, executed by Sun and DOE on September 11, 1980. Doc. 1987, Att. G.
15. Except for certain claims which were explicitly excluded, the consent order resolved all civil claims against Sun by DOE arising out of Sun's compliance with *1531 the federal petroleum price and allocation regulations administered and enforced by DOE for the period March 6, 1973 through June 30, 1980. Id. ¶ 101.
16. In January 1983, the Supreme Court denied certiorari of the reversal on appeal of this court's decision invalidating Ruling 1974-29 on substantive grounds. On February 14, 1983, the court entered judgment on the merits in favor of DOE. Shortly thereafter, Sun applied for refunds of the severance taxes that it had paid to various states, as the purchaser of a portion of the crude oil involved in M.D.L. 378, on behalf of the interest owners of the properties in question. Sun was apparently the first party to seek such refunds. Upon receiving the refunds, Sun promptly paid them into the escrow.
17. In the period since Ruling 1974-29 was finally determined to be valid, Sun has cooperated fully with DOE. When Sun discovered in 1984 that one of its regional offices, through a clerical error, had failed to report that it had counted injection wells at the Seeligson Unit, Sun promptly notified the DOE. Sun had also offered to make the escrow whole for any deficiencies attributable to the timing of Sun's initial payment into escrow. The parties, however, are in disagreement on the appropriate rate of interest.
18. According to Sun, DOE's claims against Sun encompass six overlapping categories of issues. First, approximately $8.6 million is attributable to the difference between interest at DOE's policy rates and interest at the treasury bill rates earned by funds in the escrow. Second, approximately $7.2 million involves overcharges and interest at DOE policy rates on oil taken in kind and sold by interest owners other than Sun. Third, about $3.2 million is attributable to interest at DOE policy rates on severance taxes that Sun initially remitted to various states, and later paid into escrow with such interest as Sun received. Fourth, another $5.3 million is attributable to principal and interest on severance taxes that third party purchasers remitted to state taxing authorities and failed to recover for deposit into escrow. Fifth, about $5.2 million is attributable to interest at DOE policy rates on funds that Sun held in suspense and then transferred into the escrow in August 1979, after receiving its preliminary injunction. Sixth, some $2.7 million is attributable to overcharges and interest at DOE policy rates on Sun's share of the production from the Seeligson Unit.
As stated by DOE, the issues presented for disposition are whether Sun paid the full amount of its overcharges into escrow and whether the court should apply the market level interest rates contained in DOE's policy statement to effectuate full and complete restitution. As stated by Sun, the issues presented are whether, in the unique circumstances surrounding this case, Sun can be held liable for interest at DOE policy rates and whether Sun can be held liable for severance taxes and interest thereon despite the DOE's acquiescence in, approval of, and failure to contest Sun's procedures for making escrow deposits.
Sun has not disputed the accuracy of DOE's calculations. Sun opposes the DOE's motion for summary judgment to the extent DOE seeks to hold Sun liable for interest at DOE policy rates, for unrefunded severance taxes and interest thereon, and for interest on refunded severance taxes. Consequently, summary judgment for DOE is in order unless the court finds some reason to depart from its prior decisions in this litigation regarding the interest rate and severance tax issues.
The court has addressed the appropriate rate of interest previously in this case, and has ruled that the DOE policy rates should apply. See In re Department of Energy Stripper Well Exemption Litigation, 722 F.Supp. 649 (D.Kan.1989) ("Mobil"); Mobil Oil Corp. v. U.S., 739 F.Supp. 1446 (D.Kan.1990); 746 F.Supp. 1452 (D.Kan.1990) (Gulf/Chevron). The standards for awarding prejudgment interest are well established. Requiring the payment of prejudgment interest on overcharges is a means to make whole those who have been overcharged. The trial judge has some discretion in deciding whether to award interest in government enforcement actions under section 209 of *1532 the Economic Stabilization Act, 12 U.S.C. § 1904 note. Normally, an award of restitution will include prejudgment interest. The DOE policy rates should be applied unless there are compelling reasons not to do so. See generally Mobil, 722 F.Supp. at 659-60.
Sun argues that interest at DOE policy rates is not appropriate under the unique circumstances of this case. Sun argues that there is no other case comparable to this multidistrict litigation. Given decontrol nearly a decade ago and the historic settlement reached in this case, no comparable case can possibly arise in the future. The court does not disagree with Sun's characterization of this case as truly unique. It is true that this action did not begin as a government enforcement action under section 209 of the Economic Stabilization Act; however, section 209 presents the closest analogy. Sun also argues that it did not retain all of the funds sought by DOE. The court has previously rejected this defense to interest liability. See Mobil, 722 F.Supp. at 660; Mobil, 739 F.Supp. at 1448-49. The circumstances of this case do not constitute compelling reasons not to apply the DOE policy rates of interest.
Sun also argues that the DOE is barred by the consent order from challenging Sun's method of making payments into escrow (i.e., Sun's payment of net after tax incremental revenues into escrow).[1] Paragraph 506 of the consent order provides in pertinent part:
All pending and potential claims, whether or not known, demands, liabilities, causes of action or other proceedings by DOE regarding Sun's compliance with the federal petroleum price and allocation regulations during the period covered by this Consent Order, whether or not heretofore raised by an issue letter, NOPV, NOPD, remedial order, government suit, or otherwise, are resolved and extinguished by this Consent Order, with the exception of the matters discussed in subparagraphs (a) and (b) below:
(a) Sun shall remain a party to Otis C. Peavey, et al. and Sun Oil Company (Del.) v. Department of Energy, No. 78-1410 (D.Kansas). Sun and DOE agree to be bound by the final determination of the above-captioned litigation as to whether or not injection wells are counted as wells that produce crude petroleum in determining the eligibility of property for treatment as a stripper-well property. If that question is finally decided adversely to the plaintiffs, Sun shall take all appropriate action to assist the clerk of the court in this case in making such disposition of the escrow fund as the court shall direct.
In the event of continuation by Sun of its current practice of counting injection wells for determination of stripper property status pending the final resolution of this case, DOE will not initiate or participate in any proceeding designed to allege civil and/or criminal penalties by reason of such action by Sun.

....
Doc. 1867, Att. G, ¶ 506(a) (emphasis added). Paragraph 510 of the consent order provides:

Except for the unresolved injection-well count and NGL first sale transfer price issues, the current methodologies used and determinations made by Sun, including Sun's (a) identification and categorization of crude oil producing properties, including but not limited to Sun's property determinations, (except for properties producing marginal and newly discovered oil), (b) base production control levels and posted prices applicable to crude oil produced from such properties, (c) calculation of average daily production and classification as stripper-well properties, (d) base period product and nonproduct costs, including but not limited to base period product, nonproduct and processing costs under Subpart K, (e) classes of purchaser, (f) May 15, 1973, *1533 actual and imputed selling prices to such classes of purchaser, (g) unrecovered (banked) increased product and nonproduct costs available for future recovery, (h) method used to reflect changes in the charge to its customers for bank, travel and entertainment credit cards, (i) base obligations for crude and product allocation; all of which are set forth or referred to in a letter dated September 11, 1980, from Sun to DOE, will not be subject to review, audit (except to the extent necessary to audit matters not within the scope of this Consent Order), or challenge, or referral to any other instrumentality of government for challenge, by DOE and will be regarded by DOE as correct in any administrative or judicial proceeding or action initiated by DOE. Sun may amend and refile its DOE reports to reflect the determinations set forth in said letter and all other relevant aspects of this Consent Order.
Id. ¶ 510 (emphasis added).
According to Sun, paragraph 506(a) of the consent order excepted only the narrow issue of "whether or not injection wells are counted as wells that produce crude petroleum in determining the eligibility of property for treatment as a stripper-well property," and that all other issues presented in this litigation (including Sun's payments into escrow) were settled. Sun further argues that pursuant to paragraph 510 of the consent order, with the exception of the unresolved injection-well count issue, DOE agreed to regard as correct and not challenge Sun's current methodologies and determinations. Sun concludes that DOE is therefore barred from challenging Sun's method of paying only net after tax amounts into escrow.
DOE responds that paragraph 506 of the consent order excepted the M.D.L. 378 litigation from the settlement. DOE further argues that paragraph 510 excluded the "injection-well count" issue from the methodologies and determinations which the DOE agreed not to contest.
The court finds that the consent order does not bar DOE from seeking the overcharge amounts Sun failed to remit to escrow. Sun's interpretation of the consent order would mean that regardless of the outcome of the "injection-well count issue" (i.e., whether injection wells are counted as wells that produce crude petroleum for the purpose of determining the eligibility of a property for stripper-well treatment) all potential monetary liability in this action was settled by the consent order. The language of the consent order does not support Sun's position. In paragraph 506(a) of the consent order, DOE agreed not to seek civil and/or criminal penalties against Sun based on Sun's counting injections wells for determination of stripper property status. The DOE did not agree to waive any claim for restitution for overcharges caused by the counting of injection wells. Consequently, the consent order is not a bar to the DOE's restitution claim. Given this outcome, the court does not address the remaining arguments of the parties.
IT IS BY THE COURT THEREFORE ORDERED that the Department of Energy's motion to sever (Doc. 1845) is hereby granted.
IT IS FURTHER ORDERED that the Department of Energy's motion for summary judgment against Sun Oil Company (Delaware) (Doc. 1848) is hereby granted. The Clerk shall enter judgment in favor of the Department of Energy and against Sun, ordering Sun to deposit the amount of $30,806,581, plus interest accruing after March 31, 1990 through the date of payment, into the escrow account established by the court.
IT IS FURTHER ORDERED that the motion of Oryx Energy Company and Sun Company, Inc. for partial summary judgment against the Department of Energy (Doc. 1865) is hereby denied.
NOTES
[1] Sun notes in its reply brief, Doc. 1921, at p. 17, that it is not making an estoppel argument based on the consent order. Consequently, the court will not address the DOE's arguments regarding the standards applicable to estopping the government.